# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John F. Grady | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 3676 | **DATE** | September 21, 2004 |
| **CASE TITLE** | Claeys v. Village of Brookfield | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the foregoing reasons, defendants' motion for summary judgment [20-1] is denied as to Counts III, IV, V, VI, and VII of the first amended complaint. Summary judgment for defendants is granted as to Count II, and summary judgment for the Village of Brookfield is granted as to plaintiff's <u>Monell</u> claim in Count I. Summary judgment is denied as to the remainder of Count I (which is asserted against defendant Manescalchi). This case is set for a status hearing on October 13, 2004, at 10:30 a.m, at which time a trial date will be set. ENTER MEMORANDUM OPINION.

(11) [For further detail see order (on reverse side of/attached to) the original minute order.]

| | No notices required, advised in open court. | | number of notices | **Document Number** |
|---|---|---|---|---|
| | No notices required. | | | |
| x | Notices MAILED by judge's staff. | | | |
| | Notified counsel by telephone. | | SEP 2 2 2004 date docketed | 38 |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to _____ | | date mailed notice | |
| KAM | courtroom deputy's initials | U.S. DISTRICT COURT 2004 SEP 21 PM 5:23 Date/time received in central Clerk's Office | KAM mailing deputy initials | |

(Reserved for use by the Court)

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

DANIEL CLAEYS,                          )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )      No. 03 C 3676
                                        )
VILLAGE OF BROOKFIELD and               )
LIEUTENANT MICHAEL MANESCALCHI,         )
                                        )
            Defendants.                 )

## MEMORANDUM OPINION

Before the court is defendants' motion for summary judgment.
For the reasons explained below, the motion is granted in part and
denied in part.

## BACKGROUND

This is a § 1983 action brought by plaintiff Daniel Claeys
against Brookfield Police Lieutenant Michael Manescalchi and the
Village of Brookfield (the "Village").  Plaintiff complains that
Manescalchi wrongfully arrested him and took his money.  The
following summary of the relevant facts is drawn from the parties'
Local Rule 56.1 Statements; several factual disputes exist.

SEP 2 2 2004

---

[1]  The parties' statements of fact are largely based on the deposition
testimony of plaintiff Daniel Claeys, defendant Michael Manescalchi, Cecelia
Welenowski, Roseann Majcen, Jayne Williams, Jon Claeys, and Brookfield Police
Chief Arthur Kuncl.

*Plaintiff's Home Repair Work for Cecelia Welenowski*

In August 2002, plaintiff began working for himself as a handyman doing odd jobs in the western suburbs of Chicago. He created flyers advertising "Help Around the House" and distributed them in Brookfield. Around November 18, 2002, plaintiff received a telephone call from a prospective customer, Mrs. Cecelia Welenowski, who apparently learned about Help Around the House through a flyer left at her home. Welenowski is a 76-year-old widow who owns a home in Brookfield. She needed work done in her basement and on a walkway and a patio/driveway on her property.

On November 22, 2002, plaintiff went to Welenowski's home with his wife and children. (It is disputed whether plaintiff's wife and children went into Welenowski's home, as Welenowski testified, or remained in their van, as Claeys testified.) After plaintiff examined Welenowski's basement, patio, and walkway and discussed their condition with her, he entered into an oral contract with Welenowski to make repairs. Plaintiff and Welenowski agreed that the repairs to the patio and walkway would not be a complete removal and replacement of the concrete, but patchwork where needed and blacktopping to smooth the surfaces. They also agreed that the "waterproofing" work in the basement would not be true waterproofing, but rather the application of a water-sealant paint on the basement walls and floors. In addition to the basement, patio, and walkway work, plaintiff also agreed to make a few other

small repairs, including repairs to a step and a door. Plaintiff estimated that it would take a total of six to seven days to complete all the work.

Plaintiff gave Welenowski two written price estimates. One estimate stated "repair driveway/sidewalk" for $850.00, and the other estimate stated "waterproof basement" for $270.00. These estimates total $1120.00, but according to plaintiff, he agreed to perform all the repairs for $1180.00. (Welenowski does not remember the two separate written estimates, but rather one piece of paper that showed the total estimate.) Plaintiff told Welenowski that she need only pay part of the price up front and the remainder upon completion, but Welenowski offered to pay the total amount immediately. Welenowski drafted a personal check for $1180.00 on her account at the First National Bank of Brookfield (the "Bank"), payable to the plaintiff's wife, Sharon Claeys. Later that same day, Mrs. Claeys went to the Bank and cashed the check.

Plaintiff went to various hardware stores and bought materials and equipment, including approximately 21 bags of concrete. He spent more than $500.00. On Saturday, November 23 and Monday, November 25, 2002, plaintiff began the work, including moving Welenowski's belongings away from the basement walls and starting some of the concrete work. Plaintiff worked for about six hours on November 23 and more than four hours on November 25. He

intended to continue working at Welenowski's home on November 26.

### First National Bank of Brookfield

On Monday, November 25, Welenowski called her personal banker at the Bank, Roseann Majcen. (Welenowski and Majcen typically had several long conversations each week. Majcen was aware that Welenowski was having repairs done at her house because the previous week, Welenowski had told Majcen that she had hired a repairman whose flyer she had seen and that she was having her driveway blacktopped and sealant applied in her basement. Welenowski apparently also had told Majcen how much she was paying for the work.) Welenowski told Majcen that one of her books of checks was missing, and also told Majcen the following: while the repairman was doing work in the basement, the repairman's wife and children were with Welenowski. Welenowski was reading Bible stories to the children. The repairman's wife asked to use the restroom. When Welenowski went upstairs, the wife was not in the restroom, but in another room. Some time thereafter, Welenowski discovered that a book of checks was missing. Majcen recommended that Welenowski close her current account and open a new one to prevent any possible fraudulent activity involving the missing checks.

After her conversation with Welenowski, Majcen suspected that the repairman and his wife were trying to take advantage of Welenowski, whom Majcen considered to be a "somewhat confused"

person.    Majcen spoke with a co-worker about the cost of
Welenowski's repairs, and the co-worker thought that the price
sounded "a bit excessive." (Defendants' Statement of Facts, Ex. B,
Deposition of Roseann Majcen, at 41.)    Subsequently, Majcen
telephoned the Brookfield Police Department and asked for an
officer who was doing "social service type work so they could check
and see if this was legitimate work that they were doing on the
house."    (Id.)    Majcen was referred to defendant Lieutenant
Manescalchi and left a voice-mail message for him.    Majcen stated
in the message that Welenowski, an elderly Bank customer, was
having repairs done at her house and that Welenowski suspected the
repairman's wife of taking a book of checks.    Majcen also mentioned
that she suspected that the repairman brought his wife and children
to Welenowski's house to be a "distraction" so that "maybe they
could search around and take stuff."    (Id. at 43.)    After Majcen
left this message, she prepared paperwork in anticipation of
closing Welenowski's account and opening a new one.

### Brookfield Police Involvement

Majcen testified that the next day, Tuesday, November 26,
Manescalchi came to the Bank around 9 or 9:30 a.m. to talk with
Majcen and follow up on her message.    Majcen told Manescalchi what
Welenowski had told her: Welenowski had seen a repairman's flyer
and had hired him to do driveway and sealing work; the repairman's
wife went to the restroom and Welenowski found her in a different

room; and Welenowski's checks were missing.    Majcen also told
Manescalchi the amount that Welenowski was paying for the work.
She asked him to "check out" the situation because of Welenowski's
"trusting" nature.    Manescalchi said that he would do so.

Manescalchi's version of the meeting at the Bank is different.
He believes that the meeting may have occurred on Monday, November
25 and that it did not occur on the same day he arrested plaintiff.
He testified that [Bank Vice President] Jayne Williams, not Majcen,
called him about Welenowski and that when he went to the Bank, he
met with Williams and the teller who had waited on Sharon Claeys
when she cashed Welenowski's check.    Manescalchi did not know the
teller's name.    (Evidently, he met with Majcen, although she
testified that she was not involved in the check-cashing
transaction.)    He states that Williams and the teller told him that
"somebody came in to cash one of Ms. Welenowski's checks.    They
were suspicious of the check and that they called her to verify
that it was good and that she said, yes, I wrote that check.    So
they cashed it for the individual.    I believe that was on Friday.
And then on Saturday Ms. Welenowski came into the bank and went to
that teller and told her, you shouldn't have cashed that check, I'm
being ripped off.    And that teller brought that to Ms. Williams'
attention, who, in turn, called me I believe on Monday, but I can't
say for sure."    (Defendants' Statement of Facts, Ex. D, Deposition
of Michael Manescalchi, at 107.)

Jayne Williams's account differs from Manescalchi's. She testified that she did not meet with Manescalchi before Claeys's arrest. According to Williams, Majcen and Manescalchi met on Monday, November 25, when Williams was not at the Bank. The first conversation she had with Manescalchi regarding Welenowski occurred on Tuesday, November 26, when Manescalchi brought cash to deposit in Welenowski's account, and Majcen and Manescalchi had to "fill [her] in." (Plaintiff's Exhibits in Opposition to Defendants' Motion, Ex. D, Deposition of Jayne Williams, at 20.)

Manescalchi testified that some time after the meeting at the Bank, he telephoned Welenowski but got no answer, so then he went to her house to meet with her in person. He estimates that this meeting occurred in the early morning on November 26, around 8:30 or 9:00 a.m. (Welenowski disputes that Manescalchi met with her at this point in time and testified that the first contact she had with Manescalchi occurred <u>after</u> Claeys was arrested.) He identified himself to Welenowski and said that he was there because the Bank called him and told him what she had told them. According to Manescalchi, Welenowski stated that "this nice man and his wife came over and they were doing some work for me, but I think I'm getting ripped off." (Manescalchi Tr. at 113.) Welenowski also told him that she "thought she got a new driveway put in and she paid $800 for it and that her basement was being waterproofed" and asked Manescalchi to look at her basement. (<u>Id.</u>)

Manescalchi testified that he looked at the driveway that was sealed, saw an empty five-gallon bucket of sealer, and saw one painted wall in the basement. Welenowski gave him two receipts from the person whom "she knew as Dan." (Manescalchi Tr. at 114.) The receipts totaled over $1,000.00, and his understanding from Welenowski was that $800 was the price for a new blacktopped driveway and the remaining funds were for waterproofing the basement. Manescalchi did not discuss any walkway repairs with Welenowski. He concluded that Welenowski "believed that she got a new asphalt driveway and, in fact, she had not." (Manescalchi Tr. at 129.)

According to Manescalchi, Welenowski did not know "Dan's" last name, and Manescalchi did not run any sort of records check on plaintiff prior to arresting him.[2] When Manescalchi left Welenowski's house, he instructed her to call him when the repairman arrived at her house. He did this in order "to attempt to identify [the repairman] to further investigate the home repair fraud." (Manescalchi Tr. at 140.) Some time later that day, Manescalchi received a radio call from the police dispatcher telling him that Welenowski had telephoned and said that the repairman was coming back to her house.

---

[2] Although Manescalchi testified that Welenowski showed him the two written estimate/receipts plaintiff had given her, he testified that he did not conclude that "Dan's" last name was Claeys. On the patio/walkway estimate/receipt, Claeys printed "Dan" after the preprinted phrase "in account with," and on the line below, printed "Sharon Claeys." He also signed both receipts "Dan Claeys."

*The Arrest*

Manescalchi headed back to Welenowski's house and parked three or four houses away. He saw a gray minivan pull out of an alley and approach Welenowski's house. Manescalchi turned his red lights on and stopped the minivan. (Welenowski had told him that "Dan" had a light-colored minivan.) Manescalchi also radioed for backup.

According to Manescalchi, the driver matched Welenowski's description of "Dan." The person in the passenger seat, whom Manescalchi later determined to be Daniel Claeys's brother Jon Claeys, "[l]ooked similar to [the driver]"--"[a]bout the same size, blond-ish, light color hair, longer, . . . [p]retty close to the same age." Both men had facial hair and wore "shabby" work clothes. (Manescalchi Tr. at 157-58.) Manescalchi walked up to the driver's window, identified himself and showed his badge, and asked the driver who he was and what he was doing there. The driver said, "I'm Dan Claeys, I'm doing some work for the lady here." (*Id.* at 159.) Manescalchi asked the two men to step out of the car; they did so, both exiting on the passenger side of the van. Manescalchi asked them for identification.

Two other police officers arrived, responding to Manescalchi's call for backup. Manescalchi asked them to run a computer check on the Claeyses. The resulting information was that plaintiff Daniel Claeys's license had been revoked. Manescalchi testified that he handcuffed both plaintiff and his brother and took them into

custody "[t]o complete [his] investigation of the home repair fraud." (Id. at 167.) His additional reason for taking plaintiff into custody was the driving on a revoked license.

Plaintiff's account of the arrest and ensuing events is different. He testified that he recruited his brother Jon to help him on November 26 with the work at Welenowski's home. Plaintiff and Jon arrived at Welenowski's home around 10:00 a.m. They were in plaintiff's wife's minivan, and Jon was driving, not plaintiff.[3] They parked on the street outside Welenowski's home and sat in the van for a moment or two. Both of them started to get out of the van on the passenger's side because the driver's side door was difficult to open. They saw Manescalchi pull up behind them and get out of his car.

According to plaintiff, as Manescalchi approached them, Manescalchi yelled, "You cocksuckers are ripping off my great aunt." (Defendants' Statement of Facts, Ex. A, Deposition of Daniel Claeys, at 180.) Jon replied that they weren't ripping anyone off, and Manescalchi told them that they were "scum of the earth" and that he would blow their heads off if they ever came to Brookfield again. (Id. at 181-82.) (Manescalchi flatly denies swearing at the brothers or threatening them, although he does acknowledge that he told the Claeyses that Welenowski was his

---

[3]/ Plaintiff testified that he "never ever in [his] whole life" has had a driver's license. (Defendants' Statement of Facts, Ex. A, Deposition of Daniel Claeys, at 71.)

"great aunt" when in fact she was not related to him.) Manescalchi
then asked Jon if he was Dan; Dan said no. Manescalchi turned to
plaintiff and said, "You're Daniel Claeys. How much parole time do
you have left?" (Id. at 183.) Claeys, who was on parole, said he
had two months left. Manescalchi purportedly said, "You're going
to do it in jail" and that Claeys would be charged with a Class 1
felony, punishable by 20 years in prison. Claeys was confused and
evidently asked why. Manescalchi said that Claeys was going to be
arrested for "home repair fraud, scamming the elders." (Id. at
184.) Claeys tried to explain the work he was doing for
Welenowski, but Manescalchi "didn't want to hear" anything Claeys
had to say. (Id. at 185.)

Jon Claeys's testimony regarding the arrest is similar to that
of plaintiff. Jon testified that he drove the van, not plaintiff.
According to Jon, Manescalchi threatened plaintiff that he would go
to the penitentiary for defrauding Manescalchi's "great aunt."
When Jon protested that they were not defrauding anyone,
Manescalchi told him to shut up or he would "bust" him in the head.
(Plaintiff's Exhibits in Opposition to Defendants' Motion, Ex. E,
Deposition of Jon Claeys, at 64.) Manescalchi also said that if he
caught the Claeyses in Brookfield again, he would put a bullet in
their heads. (Id. at 67.)

## At the Police Station

Manescalchi testified that the backup officers transported plaintiff and his brother to the Brookfield police station. Manescalchi interviewed them separately; he spoke to Jon Claeys first. Jon told Manescalchi that it was his brother's job and he was just helping him out. Jon didn't know anything about the price that Daniel was charging Welenowski. Jon was kept in custody briefly until his identity was verified and was released. He was not charged with any crime.

Manescalchi then talked with plaintiff. According to Manescalchi, he told Claeys that Claeys was misleading Welenowski and informed Claeys of the Illinois home repair fraud statutes. Manescalchi asked Claeys if he had permits or licenses to do the repairs; Claeys replied that he did not. Claeys asked Manescalchi what would happen if he gave Welenowski her money back, and Claeys then offered to return $600.00 to her. Manescalchi telephoned Welenowski to inquire whether she would be willing to accept $600.00 in restitution in lieu of prosecuting Claeys. She agreed and said that $600.00 would be better than nothing.

Claeys turned over $700.00 in cash to Manescalchi: $600.00 for restitution and $100.00 for bond for the driving on a revoked license charge. Claeys still had some cash left over; he did not give Manescalchi all the cash in his possession. Manescalchi gave Claeys a written receipt indicating that Claeys had paid Welenowski

$600.00 in restitution. Later that day, Manescalchi took the $600.00 cash to the Bank and instructed an employee to deposit the money in Welenowski's account. Claeys was released from custody, and Manescalchi estimates that Claeys was at the police station for about an hour.

Claeys's version of the events at the police station is as follows. After Claeys was transported to the station, he was taken into an interview room, made to empty his pockets (which contained $880.00 cash) onto a table, and handcuffed to the wall. After twenty minutes or so, Manescalchi came in and picked up the money that was on the table. He counted it and then said he was going to contact the State's Attorney "to see if we can make restitution." (Daniel Claeys Tr. at 191.) Claeys told Manescalchi that the money was his wife's rent money, and Manescalchi replied that he didn't care whose money it was--it was Welenowski's.

Manescalchi then left the interview room for about ten minutes. When he returned, he told Claeys that the State was "willing to deal." (Id. at 193.) Manescalchi stated that Claeys could either be charged with home repair fraud, a Class 1 felony punishable by 20 years in prison, or Claeys could pay Welenowski part of her money back. Claeys repeated that half of the cash he had was his wife's money. Then, according to Claeys, Manescalchi grabbed the money, counted out $80.00, put it on the table and said it was for Claeys to get his van back. Then he took out $100.00

"for bond." Claeys asked, "What bond?" (<u>Id.</u> at 194.) Manescalchi said that it was bond for the ticket he was going to write Claeys for driving on a revoked license. Manescalchi took the rest of the money, which was $700.00.

Claeys testified that he never offered to or agreed to make restitution to Welenowski and that he told Manescalchi that he didn't see why he should give his wife's money to Manescalchi. Manescalchi replied that Claeys would "get 20 years plus [his] parole time [for] scamming the elders" and that Manescalchi would call the State's Attorney. (<u>Id.</u> at 196.) Then he left the room to call Welenowski. When Manescalchi returned, he gave Claeys the $180.00 he had previously set aside and said that Claeys was being charged with driving on a revoked license. Claeys asked, "When was I driving?" and said that he was not driving, but that his brother was. (<u>Id.</u> at 198.) Manescalchi did not respond. He walked Claeys out of the room to a desk where bond is paid, and Claeys used $100.00 of the $180.00 Manescalchi gave him to pay bond. Then Manescalchi gave Claeys a receipt for $780.00 restitution and bond.

According to Claeys, $100.00 of the money he had in his pocket is missing and unaccounted for. Claeys concedes that he did not protest and tell Manescalchi that he was shortchanged, explaining that "I didn't say nothing to him. I just wanted the man as far away from me as possible." (<u>Id.</u> at 200.) Claeys did not go back to the station to make a complaint or to ask for the purportedly

missing $100.00. He never went back to Welenowski's home and left most of his equipment and supplies there, although Jon did pick up plaintiff's wheelbarrow. Because the money allegedly taken by Manescalchi included plaintiff's and his wife's rent money, they were unable to pay their rent, and their family was evicted from their apartment.

### The Aftermath

Manescalchi went to court several times in relation to Claeys's charge of driving on a revoked license. Eventually, there was a hearing on Claeys's motion to quash the arrest, at which both Manescalchi and Claeys testified about the circumstances of the arrest. The judge granted Claeys's motion, stating that "I don't believe anything that occurred that day was related to anything that was a proper police investigation." (Defendants' Statement of Facts, Ex. J, Tr. of Proceedings of April 30, 2003, at 22.) The State then moved to strike (with leave to reinstate) the charge of driving on a revoked license, and the motion was granted. Apparently, the State did not reinstate the charge.

As for Welenowski, she testified that Manescalchi spoke with her for the first time only after plaintiff was arrested. Manescalchi told her that she had been "ripped off" and that Claeys and his brother had criminal records and that she should stay away from them. Manescalchi said that he was going to return some of the money to her. Welenowski was so upset by the arrest that she

called plaintiff to apologize and ended her relationship with
Majcen for her role in the incident. The repair and maintenance
work at Welenowski's home remains incomplete because she has been
unable to find anyone else to complete the jobs for as low of a
price as plaintiff gave her. Welenowski would like Claeys to
return to complete the work, but Claeys has no desire to return to
Brookfield.

### *The Instant Action*

Plaintiff filed the complaint in the instant action on May 29,
2003. The first amended complaint contains seven counts: § 1983
claims for false arrest/false imprisonment and "unreasonable
seizure/taking" (Counts I and II); false imprisonment (Count III);
malicious prosecution (Count IV); conversion (Count V); respondeat
superior (Count VI); and indemnification (Count VII). Counts III-
VII are state-law claims. Plaintiff appears to assert Monell
claims against the Village of Brookfield in Counts I and II as
well. Plaintiff seeks compensatory and punitive damages as well as
attorney's fees.

Defendants now move for summary judgment.

### DISCUSSION

Summary judgment "shall be rendered forthwith if the
pleadings, depositions, answers to interrogatories, and admissions
on file, together with the affidavits, if any, show that there is
no genuine issue as to any material fact and that the moving party

is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering such a motion, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. See Pitasi v. Gartner Group, Inc., 184 F.3d 709, 714 (7th Cir. 1999). "Summary judgment should be denied if the dispute is 'genuine': 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Talanda v. KFC Nat'l Mgmt. Co., 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." McGrath v. Gillis, 44 F.3d 567, 569 (7th Cir. 1995).

## A. Section 1983 False Arrest/False Imprisonment (Count I) and State-Law False Imprisonment (Count III)

Defendants contend that the existence of probable cause to arrest plaintiff for home repair fraud bars recovery under § 1983. The Illinois Home Repair Fraud Act provides in relevant part:

> (a) A person commits the offense of home repair fraud when he knowingly enters into an agreement or contract, written or oral, with a person for home repair, and he knowingly:
> (1) Misrepresents a material fact relating to the terms of the contract or agreement or the preexisting or existing condition of any portion of the property involved, or creates or confirms another's impression which is false and which he does not believe to be true, or promises performance which he does not intend to perform or knows will not be performed . . . .

815 ILCS 515/3(a)(1). Home repair fraud is aggravated and considered a felony when it is committed against a person 60 years of age or older. 815 ILCS 515/5.

A police officer may make a warrantless arrest based on probable cause only "if the information available to the officer at the time of the arrest indicates that the arrestee has committed a crime." BeVier v. Hucal, 806 F.2d 123, 126 (7th Cir. 1986). "Probable cause is a fluctuating concept; its existence depends upon 'factual and practical considerations of everyday life.' It is the totality of circumstances, including the facts available to defendant, that are dispositive. Police officers are allowed to make mistakes, but those mistakes must be reasonable ones." Id. (citations omitted).

According to defendants, there is no genuine issue that Manescalchi had probable cause to arrest plaintiff for home repair fraud because of the "mosaic of suspicious circumstances" present. (Defendants' Memorandum at 4.) However, given the Seventh Circuit's observation that "probable cause is a function of information and exigency," BeVier, 806 F.2d at 127, we disagree. According to Manescalchi, he interviewed three people before arresting Claeys: a bank teller (who evidently was Majcen, although she is not a teller and did not cash the check made out to Sharon Claeys, as Manescalchi recalls); the teller's supervisor, Jayne Williams; and Cecelia Welenowski.

It is undisputed that Manescalchi spoke with Majcen before the arrest, but Manescalchi's account of the conversation is materially different from Majcen's. According to Manescalchi, Majcen told him that Welenowski said that she was being "ripped off." However, Majcen testified that the focus of her conversation with Manescalchi was the allegedly missing checks, which would indicate a possible theft, but not home repair fraud. Moreover, Jayne Williams denies that Manescalchi spoke with her before Claeys's arrest. Welenowski, the would-be complainant, also denies that Manescalchi spoke with her before the arrest. And it appears to be undisputed that Manescalchi never questioned Claeys himself about the details of the work he was doing for Welenowski.

"A police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest. Reasonable avenues of investigation must be pursued especially when . . . it is unclear whether a crime had even taken place." BeVier, 806 F.2d at 128. Because there are disputed issues of material fact regarding whether Manescalchi pursued reasonable avenues of investigation before arresting plaintiff, summary judgment for defendants on Count I will be denied.[4]

---

[4] Defendants also contend in a one-sentence argument that "if an officer does not have actual probable cause to arrest an individual, he is still entitled to qualified immunity if he had 'arguable probable cause.'" (Defendants' Memorandum at 2.) We decline to address this undeveloped argument, and in any event, there is a genuine issue of fact as to whether Manescalchi had even "arguable" probable cause.

This discussion applies equally to plaintiff's state-law claim for false imprisonment in Count III. Regarding Count III, defendants briefly and halfheartedly argue that Manescalchi also had reasonable grounds to believe that plaintiff committed the offense of driving on a revoked license, but there is a genuine issue of fact regarding whether Manescalchi had reasonable grounds to believe that plaintiff was driving the van. Plaintiff and his brother both testified that plaintiff was not driving. The state court judge presiding over the driving on a revoked license case quashed plaintiff's arrest. Defendants put great emphasis on the fact that Welenowski claims to have seen plaintiff driving on a date before his arrest, which only marginally bears on the issue of whether he was driving on the morning of his arrest.

Plaintiff appears to assert a <u>Monell</u> claim in Count I against the Village of Brookfield for the alleged false arrest. To establish the Village's liability, plaintiff must prove: (1) he suffered a deprivation of a federal right; (2) as a result of either an express municipal policy, widespread custom, or deliberate act of a decision-maker with final policymaking authority for the City; that (3) proximately caused his injury. See <u>Monell v. Department of Soc. Servs.</u>, 436 U.S. 658 (1978); <u>Ienco v. City of Chicago</u>, 286 F.3d 994, 998 (7th Cir. 2002).

Defendants contend that even if there is a genuine issue as to whether plaintiff's constitutional rights were violated, plaintiff

has not shown any municipal policy or practice of the Village of
Brookfield reflecting deliberate indifference to the risk of a
constitutional violation or causation. We agree; plaintiff has
presented no evidence of such a policy or practice. Moreover,
plaintiff does not respond to defendant's argument at all; the
Monell argument in plaintiff's response brief focuses solely on the
Count II Monell claim. Accordingly, summary judgment for the
Village will be entered on plaintiff's Count I Monell claim.

**B.    Section 1983 Procedural Due Process Violation (Count II)**

In Count II, plaintiff alleges that Manescalchi "illegally
seized" his property "without lawful justification." (First
Amended Complaint, ¶ 21.) Accordingly, Count II appears to assert
a substantive due process claim because the challenge is to the
conduct itself. However, plaintiff asserts in his brief that he
was wrongfully deprived of his money without being afforded any
pre-deprivation hearing, which is a procedural due process claim,
and cites case law pertaining to procedural due process.
Therefore, we will treat the claim as one for violation of
plaintiff's procedural due process rights.

Defendants' first argument is that no unconstitutional seizure
occurred because plaintiff "never expressly said that he would not
make restitution." (Defendants' Reply at 7.) We disagree.
Because it would not be warranted for Manescalchi to take
plaintiff's money even if plaintiff "never expressly said that he

would not make restitution," the critical issue is whether plaintiff _offered_ to make restitution. And there is a genuine issue of fact regarding the circumstances of the money transfer: plaintiff says that Manescalchi simply took his money and told him what "restitution" would be and that plaintiff neither offered nor agreed to make restitution. Manescalchi, on the other hand, claims that plaintiff freely offered to make restitution of $600.00.

Defendants' second argument is that even if there is a genuine issue regarding a deprivation, plaintiff's claim fails because he has adequate post-deprivation state court tort remedies and, indeed, has asserted a conversion claim. Plaintiff responds that "this case deals with authorized and intentional conduct outside of the state's criminal process" and thus that "[t]he availability of state court tort remedies is immaterial to this case where a pre-deprivation hearing was required." (Plaintiff's Response at 13.)

Plaintiff argues that Manescalchi took plaintiff's money "[u]nder the authority and knowledge of the municipality." (_Id._ at 12.) According to plaintiff, the Village of Brookfield "has an express policy and practice permitting 'street justice' of the sort that Manescalchi improperly meted out here." (_Id._ at 16.) However, plaintiff has presented no evidence to that effect. Brookfield Police Chief, Arthur Kuncl, testified that the Village has no written policy governing restitution. However, he did not testify that the Village allows a police officer to take a person's

money when that person has not offered the money as restitution; rather, he testified that the Village gives officers discretion to "mediate" restitution payments from suspects to victims. The purported wrongful conduct here is not that Manescalchi "mediated" restitution, but rather that he simply took plaintiff's money.

Accordingly, even accepting plaintiff's factual account, plaintiff still has not demonstrated that Manescalchi's actions were authorized by the Village. Rather, plaintiff has presented evidence of a random, unauthorized intentional deprivation. The Supreme Court has held that pre-deprivation hearings are not practicable where this type of deprivation causes the loss of property. See Hudson v. Palmer, 468 U.S. 517, 533-34 (1984). The remaining question is whether the state of Illinois provides plaintiff with an adequate post-deprivation remedy. Plaintiff does not, and cannot contend, that he is without such a remedy. The tort claim of conversion is available; indeed, plaintiff asserts a conversion claim in Count V.

Because the state has provided an adequate post-deprivation remedy, plaintiff cannot pursue a § 1983 claim for the recovery of his money, and summary judgment for defendants will be granted on Count II. Plaintiff's Monell claim against the Village in Count II fails as well.

## C.   **Malicious Prosecution (Count IV)**

Plaintiff complains that his prosecution for driving on a revoked license was malicious.   The elements of a malicious prosecution claim under Illinois law are as follows: (1) plaintiff was subjected to judicial proceedings; (2) for which there was no probable cause; (3) the defendant instituted or continued the proceedings maliciously; (4) the proceedings were terminated in the plaintiff's favor; and (5) there was an injury.   See Reed v. City of Chicago, 77 F.3d 1049, 1051 (7th Cir. 1996).

Defendants argue that "clearly Manescalchi had probable cause to arrest the Plaintiff for home repair fraud."   (Defendants' Memorandum at 13.)   The argument is irrelevant because Count IV is not concerned with home repair fraud.   Moreover, in section A, supra, we found that there is a genuine issue regarding probable cause for an arrest for home repair fraud as well.

Defendants also maintain that plaintiff has not produced any evidence showing that Manescalchi was motivated by malice.   This argument also fails.   Plaintiff testified that Manescalchi swore at him, threatened to blow his head off, asked plaintiff about being on parole and told him that he was going back to prison, ignored plaintiff's attempts to explain the work he was doing for Welenowski, and wrongfully took his money.   This testimony creates a genuine issue of fact as to Manescalchi's motivation and precludes summary judgment for defendants on Count IV.

**D. Conversion (Count V)**

Plaintiff alleges in Count V that Manescalchi wrongfully converted plaintiff's money. "The essence of conversion is the wrongful deprivation of property to the owner or the person entitled to possession." Landfield Fin. Co. v. Feinerman, 279 N.E.2d 30, 32 (Ill. App. Ct. 1972). Defendants contend that plaintiff has not shown that he was entitled to possession of the money in question "because he entered into a restitution agreement." (Defendants' Reply at 13.) Again, whether plaintiff agreed to make restitution is a genuine issue of fact.

Defendants also assert that plaintiff's conversion claim fails because he admits that he never made a demand for a return of the money. We reject this argument. Under Illinois law, "one who knowingly takes possession of personal property which belongs to another is liable to the person whose property has been appropriated whether or not a demand is made for the return of such property." Landfield, 279 N.E.2d at 33. Here, plaintiff's testimony is that Manescalchi knowingly took plaintiff's money without authorization. In addition, no demand for possession need be shown where some other independent act of conversion can be shown and a demand thus would be futile. See Pavilon v. Kaferly, 561 N.E.2d 1245, 1253 (Ill. App. Ct. 1990). It is undisputed that Manescalchi took $600.00 of the money allegedly taken from

plaintiff to the Bank and that the money was deposited into Welenowski's account there.

Summary judgment for defendants on Count V will be denied.

**E.   Respondeat Superior and Indemnification (Counts VI & VII)**

Defendants' only argument for summary judgment on these counts is that defendant Manescalchi is entitled to summary judgment on all of plaintiff's state-law claims. Because summary judgment will be denied on the state-law claims, it will be denied as to Counts VI and VII as well.

### CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is denied as to Counts III, IV, V, VI, and VII of the first amended complaint. Summary judgment for defendants is granted as to Count II, and summary judgment for the Village of Brookfield is granted as to plaintiff's Monell claim in Count I. Summary judgment is denied as to the remainder of Count I (which is asserted against defendant Manescalchi).

This case is set for a status hearing on October 13, 2004, at 10:30 a.m, at which time a trial date will be set.

DATE:     September 21, 2004

ENTER:    _____

John F. Grady, United States District Judge